WATERMAN EXPORT CORPORATION, Plaintiff, Appellee and Appellant, v. ENRIQUE VALDEJULLI, Defendant, Appellant and Appellee.

No. 12907.     Decided June 3, 1963.

---

*Hartzell, Fernández & Novas* and *Vicente M. Ydrach* for appellee and appellant. *Guillermo S. Pierluissi* for appellant and appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This is an action for recovery of money in which plaintiff urges that defendant be ordered to pay the amount of certain merchandise sold to him which he left unpaid and to pay interest on the unpaid items.

The Superior Court sustained the complaint and ordered defendant to pay the principal sum of the debt and $500 for attorney's fees, plus the costs, but made no pronouncement on the interest. Both parties appealed to this Court: plaintiff requesting legal interest on said items and the sum of $26.98

which it paid to Banco de Ponce for collection, and defendant seeking reversal of the judgment. Defendant assigns as errors (1) that the trial court concluded that Raúl Valdejulli was agent for defendant Enrique Valdejulli, and (2) that he was ordered to pay the sum claimed.

From the clear findings of fact made by the trial court, we extract those which follow, some briefly stated and others copied directly. Plaintiff is an export firm from New York. Since 1947 it had business relations with defendant, an import dealer from San Juan. Through several orders defendant ordered from Waterman certain merchandise consisting of fruit in crates and other provisions for resale in the local market.

"All the letters ordering the shipment of such merchandise are signed by Raúl Valdejulli, son of defendant Enrique Valdejulli and who used to work with his father. All those letters are written on defendant's printed paper the letterhead of which reads as follows:

E. Valdejulli—Commission Agent
P.O. Box 1854, San Juan, P.R.
Cable Address 'Valdejulli'
Meats, Fruits and Vegetables
Eggs, Cheese—Tel. 2-1181."

As a result of such correspondence, plaintiff sold and sent to defendant five shipments of fruits and provisions the total amount of which was $2,609.03. The details relative to the description of the provisions sent, ship used, numbers of bills of lading and amount of each bill appear in finding of fact No. 7 of the Superior Court and we need not reproduce them here.

"When the merchandise arrived in San Juan it was lifted from the pier by different truckmen and by Raúl Valdejulli, all of whom upon lifting the merchandise signed the corresponding 'cart checks' in the name of defendant Enrique Valdejulli, as shown by the 'cart checks' which appear in the evidence and which are marked plaintiff's Exhibit 9.

486

"In all the steps relative to the delivery of shipment, claims and shipment liquidations made by Bull Insular Line, Inc. with defendant Enrique Valdejulli, the latter's son, Raúl Valdejulli, was the person who acted on behalf of his father, defendant herein. Prior to 1948 defendant was personally in charge of these steps, but subsequent to that date he entrusted them to his son Raúl Valdejulli. The latter called personally at the office of Vicente González Grau, who handled the claims for Bull Insular Line, Inc., and followed through the different claims made by him on behalf of his father, Enrique Valdejulli, and received the different checks issued to defendant by Bull Insular Line, Inc. in payment of such claims. At no time during the periods referred to in the complaint in this case did Bull or Vicente González Grau receive instructions from defendant not to deliver to Raúl Valdejulli merchandise shipped to defendant.

"On those occasions in which defendant absented himself from Puerto Rico, his son Raúl Valdejulli handled his business in San Juan from defendant's office in San Juan."

During the period covered by the facts which gave rise to this action, Bull Insular Line, Inc., issued checks to the order of Enrique Valdejulli for claims made by the latter. Such checks were delivered to Raúl Valdejulli, on the back of which there appears an endorsement, similar in each check, which reads as follows: "Deposit to the account of E. Valdejulli Rodríguez."

"During all the dates mentioned in the complaint Raúl Valdejulli had a power of attorney from his father, defendant Enrique Valdejulli, dated October 27, 1949, authorizing him to handle all the business and matters of Enrique Valdejulli during the latter's absence. (See plaintiff's Exhibit 10.) Defendant has failed to establish in any manner whatsoever that he served notice, at any time during the periods referred to in the complaint, on Waterman Export Corporation or on Bull Insular Line, Inc. of his revocation of such power of attorney. Nor has it been proved to the court that such power had been revoked at any time.

"During all the dates referred to in the complaint the signature of Raúl Valdejulli was one of the signatures authorized to

draw on the account which plaintiff Enrique Valdejulli carried in Banco de Ponce in San Juan, Puerto Rico.

"The merchandise shipped by plaintiff to defendant and to which reference is made in the complaint has not been paid to plaintiff by defendant nor by any other person, notwithstanding the demand made to defendant. The different drafts which plaintiff sent to defendant through the Banco de Ponce were not honored, and that bank charged the sum of $26.98 to Waterman Export Corporation for the collection steps taken." (See plaintiff's Exhibit 5.)

The trial court made other findings of fact relative to a resignation from the office of manager of his father's business made by Raúl Valdejulli subsequent to the period under consideration, to conversations between Enrique Valdejulli and the President of Waterman Export, and to other particulars which are not reproduced as not being pertinent.

The trial court concluded that Raúl Valdejulli was agent for his father, Enrique Valdejulli; it found that the debt had not been paid, and rendered judgment in the terms recited above.

■■ The first error assigned by defendant was not committed. The trial court's conclusion that during the period involved herein Raúl Valdejulli was agent for his father, Enrique Valdejulli, is correct. Nor did the court err in ordering defendant to pay the debt. An agency may be express or implied; the acceptance may also be express or implied, the latter being inferred from the acts of the agent. Section 1601 of the Civil Code, 31 L.P.R.A. § 4422; *Loíza Sugar Co.* v. *Zequeira*, 63 P.R.R. 829, 837 (1944); *Dooley* v. *Pantoja*, 61 P.R.R. 619–23 (1943); *Torres* v. *P.R. Racing Corporation*, 40 P.R.R. 423, 428 (1930); *Matienzo* v. *González*, 26 P.R.R. 400, 416 (1918).

Let us next consider plaintiff's theory. In its complaint it claims interest from the time the five shipments of merchandise were delivered to defendant in San Juan, Puerto Rico. Let us examine the law applicable to this situation.

■ The transaction involved herein is a commercial purchase and sale. "A purchase and sale of personal property for the purpose of resale, either in the form purchased or in a different form, for the purpose of deriving profit in the resale, shall be considered commercial," according to § 243 of the Code of Commerce, 10 L.P.R.A. § 1701.

Since this is so, in order to determine whether the debtor defaulted, and if so, since when, it is necessary to see what the Code of Commerce provides on the matter, since commercial contracts are governed, in the first place, by that Code. Section 81, 10 L.P.R.A. § 1301.

The General Provisions of the Code of Commerce, 10 L.P.R.A. §§ 1301–14, embody precepts on the matter, but they also contain express provisions on the matter in the subchapter devoted to Commercial Purchase and Sale, 10 L.P.R.A. §§ 1701–21. Of course, we must abide by the express provisions of the Code on mercantile purchase and sale. These, as stated by Langle Rubio, are exceptions to the general rules contained in the General Provisions.[1]

Regarding when the obligation to pay the price in commercial sales begins, we find that the Code of Commerce provides in § 257 that such obligation begins after the merchandise sold has been placed at the disposal of the purchaser and after the latter has stated his satisfaction. That section reads:

"After the merchandise sold has been placed at the disposal of the purchaser and after the latter has stated his satisfaction, or if the merchandise is judicially deposited in the case foreseen in section 1708 of this title, the obligation of the purchaser to pay the price of the same in cash or at the periods agreed upon with the vendor shall begin.

"The vendor shall constitute himself the depositary of the goods sold, and shall be obliged to care for and preserve them in accordance with the laws governing deposits." 10 L.P.R.A. § 1715.

---

[1] III Langle Rubio, *Manual de Derecho Mercantil Español* 12 (1959).

■ We are not confronted with the fact that instalments were stipulated in these transactions in the case at bar. Section 257 *supra* of the Code of Commerce is identical with § 1053 of the Civil Code, which provides that in mutual obligations default begins for the other party from the time one of the persons obligated fulfills his obligation. Section 1053 also provides that the demand of the creditor shall not be necessary if the obligation or the law declares it expressly, 31 L.P.R.A. § 3017. Returning to the Code of Commerce in order to determine whether the demand of the creditor was necessary, we find that the Code provides in § 94, 10 L.P.R.A. § 1314, that in contracts in which a day is fixed for compliance therewith by the will of parties or *by law*, the effects of the delay in complying with the commercial obligation shall begin on the following day on which it falls due. In contracts in which there is none (day fixed for compliance therewith), the effects of the delay shall begin from the day on which the creditor makes demand upon the debtor. In the case of commercial purchase and sale, as we have seen (§ 257 of the Code of Commerce), the obligation to pay the price, unless otherwise agreed upon, begins after the merchandise is placed at the disposal of the purchaser and after the latter has stated his satisfaction.

Emphasizing this characteristic of commercial contracting, the Code of Commerce provides in its General Provisions, § 92, that "Laws of grace, courtesy, and others, which under any designation whatsoever defer the fulfillment of commercial obligations, shall not be recognized, but only those which the parties may have previously fixed in the contract or which are founded on a definite provision of law." 10 L.P.R.A. § 1312.

In his comments on these sections, Langle Rubio writes: "The energetic juridical tutorship of the commercial trade requires commercial obligations to offer greater security as to the time for compliance therewith. . . . But naturally,

if the creditor wishes to put up with the debtor's delay, he may do so. As explained by the Supreme Court, the purpose of the prohibition of § 61 is not to oblige one of the contracting parties to admit those periods of grace or courtesy, but it does not object if one of them wishes to accept or validate voluntarily the other party's tardiness or delay; there is nothing to prevent it, in view of the principle of autonomy of the will and freedom of contract (Judgment of March 24, 1953)."[2]

■■ It may be seen that in commercial matters, when the day is fixed for compliance with the obligation, either by the will of the parties or by provision of law, the "interpelattio" is unnecessary. When the day for compliance is fixed, the debtor defaults on the day following the one on which the obligation falls due because it is so provided by § 94 of the Code of Commerce, 10 L.P.R.A. § 1314; and § 259 of the same Code, 10 L.P.R.A. § 1717, provides that "Delay in payment for the article purchased shall obligate the purchaser to pay the legal rate of interest on the amount he owes the vendor." Naturally, the interest may be other than the legal interest, if it has been so agreed upon. As is known, the legal interest is six percent annually. Section 1061 of the Civil Code, 31 L.P.R.A. § 3025. In connection with the foregoing, see Uría, *Derecho Mercantil* 405 (2d ed. 1960); Langle Rubio, *op. cit.* at 11–14 and 163; the same author, *El Contrato de Compraventa Mercantil* 86–89 (1958); Gay de Montellá, *Código de Comercio Español Comentado* 205–06 (2d ed. 1948).; II Benito, *Manual de Derecho Mercantil* 312–13 (1924).

■ Since in the case at bar there is no covenant to the contrary, the sections *supra* of the Code of Commerce relative to commercial purchase and sale are applicable, and we con-

---

[2] Langle Rubio, *op. cit.* at 11–12. Section 61 of the Spanish Code of Commerce mentioned in that citation is identical with § 92 of our Code of Commerce, 10 L.P.R.A. § 1312.

clude that the obligation of the debtor to pay the legal interest begins on the day following the one on which he receives the merchandise, Code of Commerce, §§ 257 and 94, 10 L.P.R.A. §§ 1715 and 1314; *cf. Sucs. of Pérez Bros.* v. *Sucs. of Abarca,* 33 P.R.R. 102, 104 (1924).

The judgment rendered in this case by the Superior Court, San Juan Part, on May 22, 1957 will be modified so as to include the sum of $26.98 paid by plaintiff to Banco de Ponce for its collection steps, and to order defendant to pay interest at 6 percent annually on the following items, which represent the principal sums in each case, as of the dates specified hereinbelow which correspond to the day following the one on which defendant received the merchandise:

Item 1 ($845.41), as of February 29, 1950.
Item 2 ($607.48), as of March 21, 1950.
Item 3 ($607.28), as of April 4, 1950.
Item 4 ($265.68), as of April 11, 1950.
Item 5 ($283.18), as of April 19, 1950.

As thus modified, the judgment of the Superior Court will be affirmed. The costs, which are mandatory, are imposed on defendant, Rule 44.4 of the Rules of Civil Procedure, *Garriga, Jr.* v. *Superior Court, ante,* p. 237.